[Cite as *State v. Edmonds*, 2017-Ohio-745.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 104528**

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## MARIO L. EDMONDS

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-15-596373-A

**BEFORE:** Keough, A.J., E.A. Gallagher, J., and McCormack, J.

**RELEASED AND JOURNALIZED:** March 2, 2017

**ATTORNEY FOR APPELLANT**

Rick L. Ferrara
2077 East 4th Street, 2nd Floor
Cleveland, Ohio 44114


**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor
By: John Colan
        Patrick J. Lavelle
Assistant Prosecuting Attorneys
The Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

KATHLEEN ANN KEOUGH, A.J.:

{¶1} Defendant-appellant, Mario L. Edmonds ("Edmonds"), appeals from the trial court's judgment finding him guilty of involuntary manslaughter, corrupting another with drugs, drug trafficking, drug possession, and possessing criminal tools, and sentencing him to nine years incarceration. Finding no merit to the appeal, we affirm.

## I. Procedural History and Facts

{¶2} Edmonds was indicted in a multicount indictment on one count of involuntary manslaughter in violation of R.C. 2903.04(A); one count of corrupting another with drugs in violation of R.C. 2925.02(A)(3); two counts of drug trafficking in violation of R.C. 2925.03(A)(2); two counts of drug possession in violation of R.C. 2925.11(A); and one count of possessing criminal tools in violation of R.C. 2923.24(A). All counts except for the involuntary manslaughter count carried forfeiture specifications. Edmonds pleaded not guilty, and the matter proceeded to a bench trial at which the following evidence was adduced.

{¶3} On May 31, 2015, at approximately 1 p.m., police and paramedics responded to an apartment at 3495 East 98th Street in Cleveland in response to a 911 call of a possible overdose. The victim's former girlfriend, Marshanette Johnson ("Johnson"), called 911 when she found William Cohen ("Cohen") lying unresponsive on the floor of her apartment with a needle in his hand.

{¶4} Johnson testified that she and Cohen had been in a relationship for 38 years, although they were not together in May 2015. Johnson, a former drug addict, said that

Cohen had been a heroin addict for over 30 years, and that he used heroin every day. She testified that Cohen arrived at her apartment sometime between 11:00 a.m. and 12:30 p.m. on May 31, 2015, and that he was not high when he arrived. She said that they talked briefly and then left the apartment for approximately 10 or 15 minutes. Johnson said that after they went back to the apartment, she went to the bathroom, and when she came out five minutes later, she saw Cohen lying on the kitchen floor.

{¶5} Cleveland police officer Ryan McMahon testified that when he and his partner responded to the scene, they observed drug paraphernalia and a cell phone on the kitchen table. Johnson told the officers that no one other than Cohen had been in the apartment that day, and that she did not know where Cohen got the drugs he overdosed on, but that he must have had them on him when he arrived at her apartment.

{¶6} Cleveland police detective John Cline testified that he collected evidence from Johnson's apartment, including Cohen's cell phone and two tear-offs.[1] The tear-offs were later submitted to the Cuyahoga County forensic science laboratory for analysis but an insufficient quantity of DNA was detected on the items to allow testing. A bottle cap found on Johnson's kitchen table subsequently tested positive for heroin and fentanyl residue.[2]

---

[1]Det. Cline testified that drugs are commonly packaged in a corner of a plastic baggie, tied, and then torn off from the rest of the baggie. "Tear-off" refers to the portion of the baggie left after the knotted corner is untied and the drugs are used.

[2]Det. Cline testified that bottle caps are used to mix heroin with water. The cap is then heated, and the heroin is extracted into a needle through a filter.

**{¶7}** Cuyahoga County Deputy Medical Examiner Dr. Erica Armstrong testified that the results of an autopsy performed on Cohen demonstrated that he used drugs within 24 hours of his death and died accidentally from acute intoxication caused by the combined effects of fentanyl and cocaine. She testified further that the autopsy showed that Cohen had died within several minutes of injecting the fentanyl, and that the level of fentanyl in his system was lethal.

**{¶8}** Cleveland police detective Scott Moran ("Moran") also responded to the scene. He testified that because Cohen had no other drugs on his person and there were no other drugs in the apartment, it was apparent the drug paraphernalia recovered from Johnson's apartment was related to the drugs Cohen used in his fatal overdose.

**{¶9}** Upon looking at Cohen's cell phone, Det. Moran saw that the last text message Cohen received the day he died was at 11:43 a.m. from telephone number (216) 804-****. A Facebook search matched the number to Edmonds's Facebook page and picture.

**{¶10}** After obtaining a search warrant, the police extracted data regarding incoming and outgoing calls and text messages from Cohen's phone. Det. Moran testified that state's exhibit No. 35, the extraction report, demonstrated the following. On May 18, 2015, Cohen received a text from Edmonds's number stating, "U holding me up big bra what's up." On May 28, 2015, Cohen received a text from a number later identified as belonging to Edmonds's mother that said, "My Mario 1216804****."[3] On

---

[3] Detective Moran testified that Cohen apparently bought drugs from

May 31, 2015, the day he died, Cohen called that number at 11:04 a.m.; the call lasted only 35 seconds. At 11:35 a.m., Cohen called the number again; this time the call lasted 1 minute, 16 seconds. At 11:43 a.m., Cohen received a text from that number that stated "97 Denison." Cohen called the number after receiving the text; the call lasted 30 seconds. At 12:08 p.m., Cohen called the number again; the call lasted 34 seconds.

{¶11} Det. Moran testified that he had 11 years' experience in the police department narcotics unit and, as a result of his undercover work, was knowledgeable about how drug dealers and users in Cuyahoga County operate and communicate. He said that the amount of calls, the short duration of the calls, and the text message with only a location that were found on Cohen's cell phone were all consistent with the manner in which drug deals are facilitated.

{¶12} The police decided to pose as Cohen to see if they could get Edmonds, the suspected drug dealer, to meet them. At 11:20 a.m. on June 1, 2015, using Cohen's cell phone, Det. Moran sent a text to Edmonds's number asking "you around?" Three minutes later, Det. Moran received two telephone calls from that number. He decided not to answer the calls because he knew he would not sound like Cohen. Instead, at 11:23 a.m., Det. Moran sent a text message that said, "about to leave my girl's, can't talk right now, wanted to see you."

{¶13} Only a minute later, at 11:24 a.m., Det. Moran received a text that said "St. Clair." At 11:26 a.m., Det. Moran responded, "OK, how long?" He immediately

---

Edmonds on May 18, 2015, but after losing Edmonds's number, texted Edmonds's

received a text reply stating, "come to me if you can." Det. Moran responded, "leaving in a minute. Where on St. Clair?" At 11:27 a.m., an incoming text to Cohen's cell phone stated, "66th." Det. Moran responded at 11:28 a.m. stating, "OK same thing as yesterday leaving in a minute." At 11:41 a.m., Det. Moran texted "on my way."

{¶14} During the text exchange, Det. Moran sent several undercover police cars to the area of St. Clair and East 66th Street in Cleveland. When he knew the police were in place, at 11:55 a.m., Det. Moran sent a text that said, "I'm here. Where do you want me?" A minute later, as Cleveland police detective John Dlugolinski observed Edmonds exiting a house at 1065 East 66th Street, Det. Moran received a text stating "66th."

{¶15} The police converged on Edmonds as he was walking down the street. Edmonds was holding his cell phone in his hand, and the text he had just sent stating "66th" was still visible on the screen. He was stopped, arrested, and patted down; the police found $479 cash but no drugs on his person.

{¶16} Det. Moran testified that he gave Edmonds his Miranda rights and then told him the police knew he had met with Cohen the day before. Edmonds initially said that Cohen was his uncle, but then changed his story and said that Cohen used to date his mother. Edmonds then admitted that he met with Cohen on May 31, 2015, for five minutes in a store located at West 97th Street and Denison. The extraction report of Edmonds's cell phone showed that one of the calls from Edmonds's phone on May 31, 2015, was placed within half a mile of West 97th Street and Denison. Det. Moran

mother to get his number again.

testified that Cohen could have easily picked up drugs at West 97th Street and Denison around 11:43 a.m., traveled back to Johnson's apartment, spent time with her, and then "shot up" and died around 1 p.m., when 911 received the call from Johnson.

{¶17} Det. Moran testified that after Edmonds's arrest, Edmonds's mother gave the police permission to search her house — the one Edmonds had been seen leaving. She told them that Edmonds did not live at the house but only stayed there periodically. The police found two scales in the house, one of which tested positive for cocaine residue.

{¶18} Edmonds was then transported to the police station. Det. Dlugolinski testified that when he searched Edmonds before booking him into the jail, he found a plastic baggie with three individual bags of drugs inside it hidden behind the zipper of Edmonds's jeans. The drugs subsequently tested positive for cocaine and fentanyl.

{¶19} The trial judge denied Edmonds's Crim.R. 29 motions for acquittal and found him guilty of all charges. The court subsequently sentenced him to nine years incarceration, and this appeal followed.

## II.     Law and Analysis

### A.     Ineffective Assistance of Counsel

{¶20} In his first assignment of error, Edmonds contends that he was denied his Sixth Amendment right to effective assistance of counsel.

{¶21} To establish ineffective assistance of counsel, a defendant must show that counsel's performance was deficient, and the deficient performance prejudiced the

defense, i.e., that but for the deficient performance, the result of the proceeding would likely have been different. *State v. Bradley*, 42 Ohio St.3d 136, 142, 538 N.E.2d 373 (1989); *State v. Jones*, 8th Dist. Cuyahoga No. 102260, 2016-Ohio-688, ¶ 14. In evaluating a claim of ineffective assistance of counsel, a reviewing court must give great deference to counsel's performance. *Id.* at ¶ 16. "A reviewing court will strongly presume that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

**{¶22}** Edmonds contends that counsel was ineffective for not filing a motion to suppress because the police did not have probable cause to arrest him when he came out of the house on East 66th. He contends that he should not have been arrested for "merely answering text messages to meet someone outside," and should not have been searched at the jail after the detectives failed to find any drugs on his person when he was patted down upon arrest. He also takes issue with the search of the home of Edmonds's mother.

**{¶23}** The failure to file a suppression motion is not per se ineffective assistance of counsel. *State v. Madrigal*, 87 Ohio St.3d 378, 389, 721 N.E.2d 52 (2000). Rather, counsel's failure to file a motion to suppress is ineffective assistance of counsel only if there is a reasonable probability that, had the motion been filed, it would have been granted. *State v. Watts*, 8th Dist. Cuyahoga No. 104188, 2016-Ohio-8318, ¶ 17.

**{¶24}** The Fourth Amendment protects people against warrantless searches and seizures. There are exceptions to the Fourth Amendment's warrant requirement, however. A police officer may stop and investigate unusual behavior, even without

probable cause to arrest, when he reasonably concludes that an individual is engaged in criminal activity. *State v. Medlar*, 93 Ohio App.3d 483, 486, 638 N.E.2d 1105 (8th Dist.1994). In assessing that conclusion, the officer must be able to point to specific and articulable facts that, taken together with rational inferences from those facts, reasonably warrant the intrusion. *Id.*

**{¶25}** Furthermore, a police officer may effect a warrantless arrest if, at the time of the arrest, the facts and circumstances within the officer's knowledge were sufficient to warrant a prudent person to believe that the suspect had committed an offense. *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). Probable cause for a warrantless arrest exists when the officer has sufficient information from his own knowledge or a reliable source to merit a reasonable belief that the accused has committed a felony. *State v. Timson*, 38 Ohio St.2d 122, 127, 311 N.E.2d 16 (1974). "A warrantless arrest does not require the officer's absolute knowledge that a crime has been committed; it requires only a reasonable belief based on the totality of the circumstances." *State v. Mowler*, 8th Dist. Cuyahoga No. 100019, 2014-Ohio-831, ¶ 14.

**{¶26}** Here, it is apparent that Edmonds's arrest was constitutional. Edmonds had not "merely answered" text messages to meet someone outside his house, as he asserts; he had set up a drug deal with the police, who unknown to him, were using Cohen's phone. Although Edmonds contends that there was no mention of drugs in the texts and, therefore, no evidence of a pending drug deal, Det. Dlugolinski testified that in order to

evade law enforcement, dealers and users do not name the drugs in their texts, and the text messages are coded or in slang. The reasonable inference from the text messages and calls on Edmonds's and Cohen's phones was that Edmonds sold cocaine and fentanyl to Cohen on May 31, 2015, and that he was on his way to sell the "same thing as yesterday" to Cohen on June 1, 2015. Thus, the police had probable cause to make a warrantless arrest.

{¶27} Edmonds also objects to the warrantless search of his mother's house and the police search of him at the police station before he was booked into the jail. We find no issue with either search. The record reflects that Edmonds's mother gave the police permission to search her home. And the search of Edmonds at the police station was a search incident to arrest, an exception to the general rule that warrantless searches are unconstitutional. *State v. Smith*, 124 Ohio St.3d 163, 2009-Ohio-6426, 920 N.E.2d 949. Moreover, Det. Dlugolinski testified that even though no drugs were found on Edmonds's person upon patdown, he believed Edmonds had drugs concealed somewhere on his person because he was on his way to make a drug deal with Cohen when he was apprehended. Det. Dlugolinski said he searched Edmonds because he did not want him to transport the drugs into the jail. Such warrantless custodial searches are constitutional. *State v. Bush*, 65 Ohio App.3d 560, 563, 584 N.E.2d 1253 (8th Dist.1989) (full custodial searches are an exception to the Fourth Amendment's warrant requirement and are reasonable under the Amendment).

**{¶28}** In light of our analysis, Edmonds cannot demonstrate that a motion to suppress would have been granted had such a motion been filed. Therefore, counsel's failure to file a motion to suppress was not ineffective assistance of counsel.

**{¶29}** Edmonds also argues that trial counsel was ineffective because he did not cross-examine the state's witnesses about the quantity of drugs found on his person compared to the quantities found in Cohen's blood. He contends that to demonstrate he was not guilty, counsel should have questioned the state's witnesses to establish that although he had prepackaged drugs for sale, they did not contain "lethal" doses of fentanyl.

**{¶30}** Trial counsel is strongly presumed to render adequate assistance, and a reviewing court will not second-guess what could be considered to be trial strategy. *State v. Thompson*, 8th Dist. Cuyahoga No. 72641, 1998 Ohio App. LEXIS 2606, *12 (June 11, 1998). Here, trial counsel's strategy was to argue that the evidence was insufficient to demonstrate that Edmonds sold the drugs that caused Cohen's death. We will not now second-guess this strategy. The fact that there may have been a different strategy that Edmonds now prefers does not amount to a breach of an essential duty to one's client. *State v. Garcia*, 8th Dist. Cuyahoga No. 102546, 2016-Ohio-585, ¶ 100.

**{¶31}** Finding no ineffective assistance of counsel, the first assignment of error is overruled.

**B.    Sufficiency of the Evidence**

**{¶32}** In his second assignment of error, Edmonds contends that the evidence was insufficient to support his convictions for involuntary manslaughter and corrupting another with drugs. He does not challenge his convictions for drug trafficking, drug possession, and possessing criminal tools.

**{¶33}** Crim.R. 29(A) provides for a judgment of acquittal "if the evidence is insufficient to sustain a conviction of such offense or offenses." The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). On review for sufficiency, courts are to assess not whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction. *Id.* "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Robinson*, 124 Ohio St.3d 76, 2009-Ohio-5937, 919 N.E.2d 190, ¶ 34, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

**{¶34}** To sustain a conviction for involuntary manslaughter, the state was required to prove that Edmonds caused Cohen's death as the result of committing another felony. R.C. 2903.04(A). The predicate offenses in this case are corrupting another with drugs in violation of R.C. 2925.02(A)(3), and drug trafficking in violation of R.C. 2925.03(A)(2).[4] To convict Edmonds of corrupting another with drugs, the state was

---

[4]Edmonds does not challenge his conviction for the predicate offense of drug

required to prove that Edmonds "knowingly * * * [b]y any means, administer[ed] or furnish[ed] to another * * * a controlled substance, and thereby cause[d] serious physical harm to the other person * * *."  R.C. 2905.02(A)(3).

{¶35} The state presented evidence that on the day of his death, after Cohen called Edmonds several times, Edmonds sent Cohen a message stating "97 Denison."  The state presented further evidence from the extraction report on Edmonds's phone that Edmonds was in the area of West 97th Street and Denison on May 31, 2015.  The state also presented evidence that the drug paraphernalia found in Johnson's apartment, which subsequently tested positive for heroin and fentanyl, was related to the drugs Cohen used immediately before his death.

{¶36} The state presented further evidence that the day after Cohen's death, police officers used Cohen's cell phone and, pretending to be him, set up a drug deal with Edmonds for the "same thing as yesterday."  Indeed, when Edmonds was stopped as he was walking down the street to meet Cohen, he had his cell phone in his hand and the last text message he had sent to the police stating the location for the drug deal was visible on the screen.  When Edmonds was searched at the jail, the police did indeed find the "same thing as yesterday" hidden behind the zipper of Edmonds's jeans — three small baggies with cocaine and fentanyl — the drugs that, according to the coroner, caused Cohen's death.  Thus, it is apparent that the state produced sufficient evidence to demonstrate that

---

trafficking.

Edmonds, and not another drug dealer, sold the drugs to Cohen on May 31, 2015 that caused his death.

{¶37} Edmonds contends that the state's evidence was insufficient, however, because there was no evidence regarding what was said on the calls between Edmonds and Cohen on the day he died, and the text that said "97 Denison" could mean anything. He argues that as a 30-year heroin user, Cohen necessarily had multiple drug dealers, and the texts and calls were insufficient to establish that he, rather than another drug dealer, sold the drugs to Cohen that caused his death. This argument is without merit. Det. Moran testified that he had extensive undercover experience with drug dealers, and that short telephone conversations and short texts that give only a location are consistent with how drug deals are handled in Cuyahoga County. Furthermore, Edmonds admitted that he met with Cohen on May 31, 2015, at a store located at West 97th Street and Denison — the very location specified in his text to Cohen. And the next day, in response to short texts that never explicitly mentioned drugs, Edmonds left his house to sell drugs to Cohen.

{¶38} Construing the evidence in a light most favorable to the state, the pattern of calls and texts on May 31, 2015, coupled with Edmonds's admission that he met with Cohen, Edmonds's attempt on June 1, 2015, to sell "the same thing as yesterday" to Cohen, and the subsequent discovery on his person of the same drugs found in Cohen's system when he died, was sufficient evidence to demonstrate that Edmonds sold the drugs to Cohen on May 31, 2015, that caused his death.

{¶39} Nevertheless, Edmonds contends that the evidence was insufficient to demonstrate that he caused Cohen's death because the state did not produce evidence that he sold Cohen a lethal dose of fentanyl. This argument is likewise without merit. Deputy medical examiner Armstrong testified that Cohen's autopsy revealed that the level of fentanyl in Cohen's system was lethal, and that he died within minutes of ingesting the fentanyl. As discussed above, the evidence demonstrated that Edmonds sold Cohen the drugs that caused his death. The only conclusion, therefore, is that on May 31, 2015, Edmonds sold Cohen drugs containing a lethal amount of fentanyl.

{¶40} Construing the evidence in a light most favorable to the state, a rational trier of fact could have found the essential elements of involuntary manslaughter and corrupting another with drugs proven beyond a reasonable doubt. The second assignment of error is, therefore, overruled.

## C.   Manifest Weight of the Evidence

{¶41} In his third assignment of error, Edmonds contends that his convictions for involuntary manslaughter and corrupting another with drugs were against the manifest weight of the evidence. He makes the same arguments with respect to the manifest weight of the evidence as he does regarding its sufficiency: that the state failed to prove that he sold any drugs to Cohen on May 31, 2015, and that even if he did sell drugs to Cohen that day, the state did not prove he sold a lethal dose of fentanyl.

{¶42} A manifest weight challenge questions whether the prosecution met its burden of persuasion. *State v. Thomas*, 70 Ohio St.2d 79, 80, 434 N.E.2d 1356 (1982).

A reviewing court may reverse the judgment of conviction if it appears that the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541 (1997). A conviction should be reversed as against the manifest weight of the evidence only in exceptional cases where the evidence weighs heavily against the conviction. *Id.* This is not that exceptional case.

{**¶43**} As set forth in our analysis of Edmonds's sufficiency argument, the pattern of calls and texts between Edmonds and Cohen on May 31, 2015, Edmonds's admission that he met with Cohen that day, Edmonds's attempt on June 1, 2015, to sell "the same thing as yesterday" to Cohen, and the autopsy results showing that the drugs found in Cohen's system matched the drugs found on Edmonds after his arrest all demonstrate that Edmonds knowingly sold the drugs to Cohen that caused his death.

{**¶44**} The trier of fact did not clearly lose its way in finding Edmonds guilty of involuntary manslaughter and corrupting another with drugs. The third assignment of error is therefore overruled.

{**¶45**} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having

been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

KATHLEEN ANN KEOUGH, ADMINISTRATIVE JUDGE

EILEEN A. GALLAGHER, J., and
TIM McCORMACK, J., CONCUR